IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDDIE RAPOZA, | No. C 08-5616 WHA (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| JAMES WALKER, Warden, | |
| Respondent. | |

## INTRODUCTION

This is a habeas action filed pro se by a state prisoner pursuant to 28 U.S.C. 2254. Respondent was ordered to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it. Petitioner has filed a traverse. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

In 2005, a jury in San Mateo County Superior Court convicted petitioner of one count of first-degree murder and two counts of second-degree murder (Cal. Pen. Code § 187(a)), and found true a multiple-murder enhancement allegation (Cal. Pen. Code § 190.2(a)(3)). The trial court sentenced him to 25 years to life without the possibility of parole for the first-degree murder and two consecutive terms of 15 years to life for the second-degree murders.

On August 10, 2007, the California Court of Appeal affirmed (Exh. 9). The California Supreme Court denied petitioner's petition for review on November 14, 2007 (Exh. 13).

Petitioner also filed a state habeas petition in the California Supreme Court, which was denied on October 28, 2008 (Exhs. 14, 15). Petitioner filed the instant federal habeas petition on December 16, 2008.

The following background facts describing the crime and description of evidence presented at trial are from the opinion of the California Court of Appeal. *See People v. Rapoza*, 2007 WL 2285939, 1-5 (Cal. Ct. App. Aug. 10, 2007).

**A.   THE CRASH AND AFTERMATH**

Petitioner drove off a cliff in Moss Beach in a van containing his pregnant wife, Raye Rapoza, and four-year-old daughter, Tehani, on October 6, 2002. The van had accelerated quickly along the street leading to the cliff. It did not appear to brake or turn to avoid the cliff, instead turning slightly to follow a path to the cliff. The van landed in the ocean. Raye died almost immediately from injuries she suffered in the crash. The fetus she was carrying, which was viable and at 30 to 32 weeks gestation, died with her. Tehani also suffered serious injuries and died shortly after she was taken to hospital.

After the crash, petitioner told a paramedic that his foot had become caught beneath the brake pedal and that he could not get his foot off the accelerator. Petitioner also told a resident, Michael Zerbe, who had come to help that his foot had become stuck in the accelerator.

**B.   PETITIONER'S STATEMENTS**

Joseph Farmer and Gary Ramos of the San Mateo County Sheriff's Office investigated the crash. Two days after the crash, they visited petitioner at the hospital. They first spoke with petitioner's nurse, who told them petitioner had been carrying on conversations and had received a low dose of medicine for his pain. They also spoke with petitioner's pastor, who indicated he had just spoken with petitioner and petitioner seemed alert and lucid. Petitioner told the officers he and Raye had stopped at a lookout point off the road to watch the waves. They got back in the van, and his shoe became wedged between the gas pedal and the console when he put his foot on the gas pedal. When he tried to pull his foot out, the airbags deployed. He stepped on the brake but could not stop the van from going over the cliff.

In a second interview the following day, petitioner again told Farmer and Ramos his foot

1   had become stuck in the accelerator. He denied having stopped the car or gotten out of the van,
2   but said his foot had become stuck as he was driving, just before he was going to make a turn.
3   He was wearing new shoes, which he thought might have been too wide. He initially told them
4   he and Raye had a good relationship. Later, he admitted that the two of them had argued
5   frequently, though not seriously. He had accused Raye of being unfaithful to him, he believed
6   she was involved with another man, he did not believe he was the father of the baby she was
7   expecting, and he thought she had been gathering money in preparation to leave him.

8   After reading petitioner his *Miranda* rights, Ramos asked if it had become "too much for
9   [him]" and he had "made a bad decision in the spur of the moment." Petitioner replied, "I think
10  so." He said he and Raye had been fighting because petitioner thought she was unfaithful. He
11  had tried to frighten Raye by driving toward the cliff, and his foot had become stuck. He was
12  asking her to tell him the truth as he drove. The following exchange took place during the
13  interview: "Q. Were you trying to hurt yourself, too? [¶] A. Yeah. [¶] Q. What's that? [¶] A.
14  Yes. [¶] Q. Did you want to die there? [¶] A. No, yes. All of us. [¶] Q. You wanted everybody
15  to die? [¶] A. All my family * * * [indicates unintelligible portions of tape-recorded interview]
16  family * * * [¶] Q. [W]hen did you make that decision that you wanted everybody to die? [¶]
17  A. in that * * *. The more evidence that came out. I mean, shit. [¶] Q. Are you talking about
18  that morning or you're talking- [¶] A. That, that previous morning. . . ." He told the officers he
19  had wanted Raye to "tell [him] the truth and get out of the car." Raye started talking, and he
20  accelerated and drove off the cliff. He had decided to drive off the cliff, and he told Raye to get
21  out and take Tehani with her because he was going to do so. She stayed in the car, trying to
22  "call [his] bluff," according to petitioner, because she did not believe he would drive off the
23  cliff if she stayed in the car. The following discussion took place: "Q. . . . [W]hy did you take
24  off if they were still in the car? [¶] A. Cause I called her bluff. [¶] Q. Okay. So you knew all
25  three of you were going to die? [¶] A. Somewhat. [¶] Q. What about, what about the baby that
26  Raye was carrying? [¶] A. The baby wasn't my baby. [¶] Q. Did you want to kill the baby,
27  also? [¶] A. I wanted to kill the guy who made that baby. [¶] Q. What about, what about the
28  baby? [¶] A. I just, like I said I wanted * * * Tell me the truth * * *. [¶] Q. So, when Raye

3

didn't get out of the car, you knew she was going to die with you?  You knew Tehani was going to die with you?  Were you thinking. [¶] A.  All for one.  One for all."  Petitioner also told the officers, "I don't want to go to jail.  Can you guys give me the electric chair?"

Three days later, petitioner was being taken from the jail to a hospital for treatment.  The paramedic who was caring for him asked him why he had driven the van over the cliff.  Petitioner answered, referring to his wife, "The bitch was evil.  She had to die," or "Because she was a cheating bitch."  The paramedic asked, "Why the little girl?"  Petitioner called Tehani a "cunt" and said she was involved in the affair Raye was having, saying something like "the cunt was protecting [Raye]."

C.  **THE ACCIDENT RECONSTRUCTION**

An automotive technician for the California Highway Patrol examined the van after the crash and found no problems that would have caused it to go off the cliff.  Stein Husher, a research engineer specializing in automobile-accident analysis and accident reconstruction, inspected the van, an exemplar vehicle, the site, the shoes petitioner was wearing at the time of the crash, and a report analyzing the vehicle's data recorder.  He concluded the van's airbags did not deploy until the van went off the cliff and struck the beach.  Based on experiments he conducted with petitioner's shoes and the exemplar vehicle, Husher concluded it was not possible for petitioner to get his foot stuck between the accelerator and the center console or for him to catch his foot under the brake pedal in a way that would cause acceleration.

D.  **PETTIIONER'S MARRIAGE WITH RAYE**

Petitioner's marriage to Raye was rocky.  They grew up in Hawaii, where they met and married.  At some point, apparently in the mid-1990's, they moved to California, but visited Hawaii on vacations.  Raye's brother testified at trial that he lived with petitioner and Raye for about eight months in Hawaii in 1993 or 1994.  During that time, the couple would often quarrel while driving, and when they did so, petitioner would drive recklessly.  For instance, he would act as if he was going to drive through a red light or a stop sign, but stop at the last moment.  When she pleaded with him to stop, he would only drive more recklessly.

Petitioner was arrested in Hawaii in approximately February 2002 for assaulting Raye.

4

She returned to the mainland without petitioner. After petitioner returned to California, the fighting became so bad that Raye took Tehani and moved in with Raye's brother-in-law, Gary Maganaris, and his wife. She told Maganaris she thought petitioner would kill himself if she left him, and she told him petitioner had threatened to do so.

Maganaris met with petitioner, who told him he believed Raye was taking money from the couple's account in preparation for moving away. He told Maganaris he would kill himself if Raye left him permanently. In April 2002, Raye told Maganaris petitioner had called her and said something like, "I just wanted to say I love you before I end it," then had hung up the telephone. She took his statement as a suicide threat and called the police.

Raye's cousin, Joshua Torres, saw Raye and her family approximately every other weekend, and occasionally spent the night at their home. He noticed that petitioner became jumpy and edgier during 2002, became verbally abusive to Raye, spoke to her in a mean or aggressive tone, and tried to know where she was at all times. About a year before the crash, at petitioner's suggestion, petitioner and Torres went to the spot at Moss Beach where petitioner later drove off the cliff. Petitioner asked Torres, "Do you think you would live or die if you jumped off?" Torres was laughing, but petitioner was not.

A colleague of petitioner recalled that petitioner had told him he was having problems in his marriage, that he thought Raye was having an affair, and that he would kill himself if his marriage ended.

Ann Mendoza, a friend of Raye, testified that Raye had told her that whenever she and petitioner argued, he told her that he would kill himself if she left him. In particular, when they were driving, he would threaten to drive off a cliff if she left him. In 1995, Raye called Mendoza, crying and upset. She told Mendoza that during an argument, petitioner had put a knife into her hand and told her to kill him if she wanted to leave him. In 2002, Raye told Mendoza about the periodic difficulties in the couple's relationship and about her desire to make the marriage work. Mendoza expressed her concern for Raye's safety and advised her to leave petitioner, but Raye told her she did not think petitioner would hurt her or Tehani. She was concerned, however, that he would harm himself.

5

After the crash, petitioner called Raye's father and asked him to write a character letter on his behalf. Raye's father asked petitioner if the crash had been an accident, and said that if petitioner assured him it had been, he would write the letter petitioner requested. Petitioner did not answer Raye's father's questions. He did, however, tell Raye's father that he thought Raye had been unfaithful to him.

**E.    THE DEFENSE**

The defense presented expert testimony that petitioner's foot could have become caught between the accelerator and brake pedals, resulting in the accelerator being depressed more than halfway. Such an event could lead to hypervigilance, or a panicked state in which the driver could not react in time to avoid an accident.

## ANALYSIS

**A.    STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of section 2254(d)(1), if it correctly

identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Ibid.*

Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

**B.  ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner asserts that: (1) his confession was involuntary because he was on mind-altering medication at the time he spoke with police investigators; (2) the admission of his wife Raye's past statements violated his Confrontation Clause rights; (3) the trial court erroneously failed to instruct the jury on manslaughter as a lesser included offense; (4) the trial court denied him access to certain sealed documents on appeal, depriving him of effective assistance of appellate counsel as well as due process and equal protection rights; and (5) trial counsel was constitutionally ineffective in failing to call Michael Zerbe as a defense witness. Four other claims were previously dismissed.

**1.  Voluntariness of Confession**

Petitioner claims that his confession to police investigators was involuntary and coerced.

7

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. *Miller v. Fenton*, 474 U.S. 104, 116 (1985); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Absent police misconduct causally related to the confession, there is no basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989).

To determine the voluntariness of a confession, we must consider the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)); *see, e.g., United States v. Heller*, 551 F.3d 1108, 1112-13 (9th Cir. 2009) (defendant's argument that his ingestion of Tylenol with codeine the morning of his confessions rendered his confessions involuntary rejected: defendant didn't tell officers that he took meds, defendant appeared to be alert and able, atmosphere of interview was friendly and cordial, interview was only two hours, and defendant was repeatedly told that he was free to leave; that defendant took medication triggered question of whether he was "unable to exercise free will due to an impaired mental state," which was also rejected).

Here, the record shows that the trial court held a hearing on this issue and subsequently denied the claim in a written order (Exh. 1 at 1435-45). The trial court made detailed findings. Based on the testimony of petitioner's attending nurses and doctors, it found petitioner had faked a seizure en route to the hospital and that the drugs he was given, with the exception of one painkiller, would have been out of his system by the time of the interviews (*id.* at 1436). The trial court also found that petitioner was lucid and able to be interviewed and that he was conscious of the information he shared (*id.* at 1437-38). Significantly, the trial court found that

1    the investigating officers were "quite solicitous" of defendant's condition; that petitioner was
2    "willing to talk to the detectives"; and that petitioner "was aware that the detectives would leave
3    and stop the interview if he wanted" (*id.* at 1438-39, 1442). The court further found that
4    petitioner was read his *Miranda* rights several times and that he did not assert his right to
5    remain silent (*id.* at 1439-41).

6    Based on the record, the trial court's determination that petitioner's confession was
7    voluntary was not clearly erroneous. *See* Exh. 1 at 156-244 (transcript of Oct. 8-9, 2002
8    recorded interviews with police investigators); Exh. 1 at 770 (clinical psychologist report
9    finding petitioner "lucent" and "aware" at interviews); Exh. 3 at 340-485, 494-549 (testimony
10   of Dr. Pablo Stewart); Exh. 3 at 563-647 (testimony of Dr. Jose Maldonado); Exh. 3 at 651-733
11   (testimony of Nurse Veronica Sherwood); Exh. 3 at 756-809 (testimony of Nurse Martha
12   Villanueva); Exh. 3 at 811-56 (testimony of investigator Joseph Farmer); Exh. 3 at 867- 938
13   (testimony of Dr. James Missett); Exh. 3 at 944-60 (testimony of Dr. Adam Seiver); Exh. 3 at
14   963-95 (testimony of Dr. Robert Neal Pavy);  Exh. 4 at 21-112, 129-31 (testimony of
15   investigator Gary Ramos). Specifically, the record shows that petitioner was interviewed by
16   two officers in a non-custodial setting for short segments of time on two separate days, during
17   periods when both petitioner and medical staff agreed that he was capable of having a lucid
18   conversation, with the option of ending the interviews at any time. Under these circumstances,
19   petitioner cannot show the "coercive police activity" required to prove that his confession was
20   not voluntary.

21   Accordingly, the state court's denial of petitioner's coerced confession claim was not
22   contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor
23   based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas
24   relief on this claim.

25   **2.    Confrontation Clause Claim – Admission of Victim's Statements**

26   Petitioner claims that the trial court violated his Sixth Amendment right to confront a
27   witness against him when it (a) admitted certain out-of-court statements made by Raye to show
28   state of mind, and (b) admitted certain out-of-court statements made by Raye through the

9

1  "forfeiture by wrongdoing" exception to the hearsay rule. The claims are without merit.

2  The Confrontation Clause guarantees the defendant a face-to-face meeting with
3  witnesses appearing before the trier of fact. *See Coy v. Iowa*, 487 U.S. 1012, 1016 (1988). The
4  ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a
5  procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61
6  (2004). It commands, not that evidence be reliable, but that reliability be assessed in a
7  particular manner: by testing in the crucible of cross-examination. Out-of-court statements by
8  witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the
9  witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the
10 witness. *Id.* at 59. "Testimonial hearsay" can be roughly defined as "statements that were made
11 under circumstances which would lead an objective witness reasonably to believe that the
12 statement would be available for use at a later trial." *Id.* at 52. While the Supreme Court has
13 not articulated a comprehensive definition of testimonial hearsay, "[w]hatever else the term
14 covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury,
15 or at a former trial; and to police interrogations." *Id.* at 68.

16 A *Crawford* claim, like all other Confrontation Clause claims, is subject to harmless
17 error analysis. *See United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004). In the context
18 of reviewing a state court conviction under 28 U.S.C. 2254, this means that relief is in order
19 only if the admission at issue "had substantial and injurious effect or influence in
20 determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

21 **a.    Victim's Statements Introduced Through Friends and Family**

22 At trial, Raye's statements were primarily introduced through the testimony of her
23 friends and family. The California Court of Appeal summarized the statements as follows:

> The jury heard evidence of various statements Raye had made
> regarding [petitioner's] suicide threats and her views of the
> couple's marriage. In particular, Maganaris, Raye's brother-in-
> law, testified that Raye had told him [petitioner] would kill
> himself if she left him, that [petitioner] had threatened to burn
> Maganaris's house down, and that he had threatened physical
> harm to Raye's parents; Allen, Raye's friend, testified that Raye
> had told her [petitioner] was possessive and had threatened to kill
> himself if she left him; and Mendoza, Raye's friend, testified that
> Raye had told her [petitioner] threatened to kill himself if she left

10

>him, that he had threatened to do so by driving off a cliff, that in 1995 he had given Raye a knife and told her to kill him if she wanted to leave him, and that Raye was afraid [petitioner] would harm himself if she left him.

*People v. Rapoza*, 2007 WL 2285939 at 5.

Petitioner contends that Raye's statements were inadmissible under *Crawford* (Pet. Exh. B at 44–45). However, the statements were not made to government employees or agents. Nor were they sworn or solemn declarations made during prior testimony, at a preliminary hearing, before a grand jury, at a former trial or to the police. Nor were they made in connection with any government proceeding or investigation. Rather, they were made to the victim's family and friends. *Cf. United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (statements made to declarant's family members not "testimonial" under *Crawford*). Petitioner has pointed to no authority, nor is the court aware of any, suggesting that such remarks are "testimonial" for purposes of the Confrontation Clause under *Crawford*. Indeed, *Crawford* itself suggests to the contrary. *See Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.")

Because the statements are nontestimonial, their admission did not violate the Confrontation Clause.[1] Their admissibility was a question of state evidence law. Here, the California Court of Appeal determined that the statements were admissible under California Evidence Code section 1250 as an exception to hearsay. *People v. Rapoza*, 2007 WL 2285939 at 6. This order will not disturb the California Court of Appeal's interpretation of California evidence law. Accordingly, petitioner's claim is denied.

### b.   Trial Court's Application of "Forfeiture by Wrongdoing" Doctrine

Petitioner claims that the trial court improperly applied the doctrine of "forfeiture by wrongdoing" as a basis to admit certain of Raye's statements. Specifically, the trial court found that petitioner had forfeited his right to confront Raye regarding her statements due to his

---

[1] Petitioner conceded in his reply briefing to the California Court of Appeal that the admission of the non-testimonial statements did not violate the Confrontation Clause and noted that he was only challenging the applicability of state evidence law (Exh. 8 at 10).

11

wrongful act in killing her.

In his reply briefing to the California Court of Appeal, petitioner seemed to concede that this argument only applied to Raye's testimonial statements, specifically (1) statements she made to police in 1995 when applying for a restraining order; and (2) statements she made in 2002 when police arrested petitioner for domestic violence (Exh. 8 at 10, 13). It appears that the trial court applied the "forfeiture by wrongdoing" doctrine to only these statements (Exh. 3 at 1107-09, 1122-26, 1332, 1337-38). In any event, given the above analysis that it was not error for the state courts to deny petitioner's claim as to non-testimonial statements, this order will only address whether petitioner's Confrontation Clause claim has merit with regard to Raye's testimonial statements.

Subsequent to the denials of petitioner's direct state appeal and state habeas petition, the Supreme Court issued a decision that rejected one of the theories on which the California Court of Appeal had relied to reject petitioner's claim. In *Giles v. California*, 554 U.S. 353 (2008), the Supreme Court held that the "forfeiture by wrongdoing" doctrine extinguishes the right of confrontation only when the defendant engaged in conduct designed to prevent the witness from testifying. *Id.* at 359. It is not enough that the witness is unavailable as a result of the defendant's acts; rather, that unavailability must be the result of defendant's acts taken with the intent to prevent the person from appearing as a witness. *See id.* at 357-68. There is no evidence here that the killing was done with the intent to prevent Raye from appearing as a witness against petitioner. Therefore, under *Giles*, petitioner did not forfeit his right of confrontation with regard to Raye's statements. The California Court of Appeal's rejection of petitioner's Confrontation Clause claim on the ground that he had forfeited it by killing the maker of the statement therefore cannot be relied upon to uphold his conviction.

Petitioner has not established, however, that the violation had a "substantial and injurious effect or influence in determining the jury's verdict," as is required for habeas relief in this context. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). First, while the trial court, during pre-trial proceedings, found the statements admissible, the court cannot find any place in the record where the statements were actually introduced into evidence. Thus, the statements

12

simply cannot have affected the jury's verdict as they never reached the jury.[2]

Even assuming they were introduced, however, the admissions that petitioner made on his own were so highly incriminating that this order cannot say that these two limited areas of testimonial statements made by Raye prejudiced petitioner. As discussed above, petitioner admitted to police investigators that he believed he had made a bad decision in the spur of the moment, that he and Raye had been fighting, that he asked Raye to tell him the truth about whether she had been unfaithful, that he drove toward the cliff to scare Raye, that he was trying to hurt himself, that he drove toward the cliff to call Raye's "bluff," and that he wanted all three of them to die there. As also discussed above, when the paramedics transferring petitioner from jail to the hospital asked him why he had driven the van over the cliff, petitioner answered "The bitch was evil. She had to die," or "Because she was a cheating bitch."

The other evidence against petitioner was similarly overwhelming. As described above, this included eyewitness and expert automotive and accident reconstruction testimony that the crash was not an accident. In addition, as also discussed above, multiple of Raye's family members and friends testified to petitioner's various suicide threats and Raye's statements regarding her views of the couple's marriage. In any event, the testimonial statements Raye made on the occasions set forth above were merely cumulative of undeniably non-testimonial statements that were properly introduced at trial. Significantly, Raye's non-testimonial statements to family members and friends revealed the substance of both the "testimonial" incidents, including the statements petitioner challenges on confrontation grounds. To the extent the jury may have considered the challenged statements as evidence that petitioner had previously threatened suicide and that Raye intended to end the marriage, the same evidence came before the jury in far greater detail through the testimony of Anne Mendoza, Angela Allen, Joseph Farmer, Michael Minerva and Gary Maganaris (Exh. 3 at 2191, 2196-98, 2296-2300, 2303-06, 2311, 2250, 2257, 2262, 2256).

In addition, Deputy Sheriff Joseph Farmer testified that petitioner told him that he had

---

[2] The California Court of Appeal similarly noted that the parties failed to point to the portion of the record in which such statements were actually introduced. *People v. Rapoza*, 2007 WL 2285939, at 7, n.10.

13

deliberately frightened Raye with his driving in the past (*id.* at 2320, 2346), and petitioner's co-worker, Michael Minerva, testified that petitioner told him "if the relationship didn't work out, that he was going to commit suicide" (*id.* at 2284-85, 2287-88). Mr. Minerva also testified that petitioner had told him about the incident in Hawaii in which he was incarcerated after threatening suicide (*id.* at 2288). Raye's brother-in-law, Gary Maganaris, testified that petitioner and Raye argued frequently and corroborated that petitioner threatened to kill himself if Raye left him (*id.* at 2179-80, 2183-85, 2187-88, 2191, 2194).

Thus, the statements petitioner challenges on Confrontation Clause grounds are cumulative of other properly admitted evidence and their admission was therefore harmless, even if erroneous. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (the importance of a witness' testimony, whether statements are cumulative, the presence or absence of corroboration, the extent of cross-examination allowed, and the overall strength of the prosecution's case are the factors to consider in deciding whether introduction of statements is harmless). In sum, looking at the overwhelming evidence in total against petitioner, it cannot be said that Raye's testimonial statements had a substantial or injurious effect on the verdict, even assuming they were admitted. *See Brecht*, 507 U.S. at 637.

After a careful review of the record, this order concludes that the state court's decision rejecting petitioner's Confrontation Clause claims was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to federal habeas relief on these claims.

### 3. **Jury Instruction**

Petitioner claims that the trial court denied his right to due process when it refused his request to instruct the jury on vehicular manslaughter (Cal. Pen. Code § 192(c)(1), (2)) as a lesser included offense of murder. Petitioner fails to state a viable claim for habeas relief because the failure of a state trial court to instruct on lesser-included offenses in a non-capital case, such as this one, does not present a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).

14

1    Furthermore, the state appellate court determined that, under California law, vehicular
2 manslaughter is not a lesser-included offense of murder. *People v. Rapoza,* 2007 WL 2285939
3 at 8. To the extent that petitioner is challenging the state court's interpretation of its own law,
4 this claim is not cognizable on federal habeas. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).
5 Accordingly, petitioner is not entitled to federal habeas relief on this claim.

### 4. Sealed Portions of Appellate Record

Petitioner claims that his right to effective assistance of appellate counsel and his due process and equal protection rights were violated when counsel was not provided with the complete record on appeal. Specifically, he complains, as he did on direct appeal, about the state trial court's denial of his request to review documents filed under seal. The state appellate court rejected this claim as follows:

> In his opening brief on appeal, [petitioner] contends he was deprived of his right to a complete record on appeal because he had been denied access to certain transcripts and other documents. After the opening brief was filed, this court granted [petitioner] access to all of the sealed documents except those relevant to his motion for discovery of the personnel records of Farmer and Ramos of the San Mateo County Sheriff's Office pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. We have reviewed the sealed transcript of the hearing on the *Pitchess* motion and the personnel files that the trial court reviewed in camera, and conclude the trial court did not abuse its discretion in declining to disclose any information from the files to the defense. (*See People v. Mooc* (2001) 26 Cal.4th 1216, 1232.).

*People v. Rapoza*, 2007 WL 2285939 at 9.

According to the state appellate court, petitioner received all the records about which he complained in his opening brief on appeal with the exception of the personnel records of the two investigating law enforcement officers under *Pitchess* to which he was not entitled unless he made the proper showing.[3] Petitioner does not specify further on federal habeas any specific

---

[3] In a *Pitchess* motion, a criminal defendant moves to compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge. *People v. Mooc*, 26 Cal. 4th 1216, 1219-20 (2001), as modified (Jan. 29, 2002); *Pitchess v. Superior Court*, 11 Cal. 3d 531 (1974), *superseded by statute*, Cal. Evid. Code §§ 1043-1045.

15

court records to which he was denied access.

The state appellate court conducted an in camera review of the sealed hearing transcripts and personnel files of the law enforcement officers. The state court concluded that the trial court did not abuse its discretion in declining to disclose those records to the defense. *Ibid.* To the extent that petitioner is challenging the state appellate court's rejection of his claim of trial court abuse of discretion, this claim is not cognizable because it challenges the application of state law. *Estelle v. McGuire*, 502 U.S. at 67-68.

To the extent that petitioner is claiming that the trial court violated his federal due process rights, his claim is cognizable on federal review. In order to demonstrate that his due process rights were violated by the state court's denial of access to law enforcement personnel files, petitioner has to show that the files contained evidence that qualify as material under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Under *Brady*, the petitioner must first make a preliminary showing that the file contains undisclosed material evidence if he wants judicial review of the records to determine if any should be disclosed. *Harrison v. Lockyer*, 316 F.3d 1063, 1066 (9th Cir. 2003) (finding no due process violation where petitioner made no showing that police officer's file contained complaints material to petitioner's defense).

Petitioner did not make that preliminary showing of materiality in the state appellate court, and he has not made it here. As was the case in *Harrison*, the absence of any showing that there was any exculpatory evidence to be found in the officers' personnel records is fatal to petitioner's claim. *See Harrison*, 316 F.3d at 1066.

Moreover, any error is not grounds for granting habeas relief unless it had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637. As set forth above, the evidence of guilt was strong, and the jury rejected petitioner's defense that the incident was accidental. Evidence concerning the officers was largely irrelevant.

Accordingly, the state court's denial of petitioner's claim that he was denied access to

16

1  records was not contrary to, or an unreasonable application of, clearly established Supreme
2  Court precedent, nor based on an unreasonable determination of the facts. Petitioner is not
3  entitled to federal habeas relief on this claim.

**5.       Ineffective Assistance of Trial Counsel**

Petitioner claims that trial counsel rendered ineffective assistance by failing to call eyewitness Michael Zerbe on behalf of the defense. The claim is without merit.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Ibid.* The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction. *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim under *Strickland*, petitioner must establish two things. First, he must establish that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694.

A habeas petitioner has the burden of showing through evidentiary proof that counsel's performance was deficient. *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th Cir. 1990). He must also point to specific errors made by trial counsel. He cannot state a claim of ineffective assistance of counsel otherwise. *See United States v. Cronic*, 466 U.S. 648, 666 (1984).

In support of his claim, petitioner appends Exhibit D to his habeas petition, which he claims is a letter from Mr. Zerbe to the San Mateo Board of Supervisors. In the letter, Mr. Zerbe allegedly states that when he pulled petitioner from the water, petitioner's foot "was

17

entangled in the strap of a cooler made of nylon material" (Pet. Exh. D). Mr. Zerbe allegedly goes on to state in the letter that he testified to these facts in court "prior to [petitioner's] jury trial" and that "[petitioner's] defense attorney never even mentioned the cooler." *Ibid.*

The record reveals that petitioner's claim has no factual merit. Mr. Zerbe did in fact testify at petitioner's trial on March 3, 2005 (Exh. 3 at 1404-32). While he was called as a prosecution witness, defense counsel took the opportunity to cross-examine Mr. Zerbe. *Ibid.* Furthermore, defense counsel did question Mr. Zerbe about the blue bag that he pulled from petitioner's foot. Specifically, Mr. Zerbe testified:

> I looked down, and I seen something tugging on [petitioner's] foot, and there was a blue bag looped over his foot. So I took it off because I thought the waves going in and out was hurting his foot so I took it off his foot.

(*id.* at 1420). Mr. Zerbe testified that he threw the bag aside and did not recall pointing it out to anyone (*id.* at 1421). Defense counsel went on to elicit more details about the blue bag, and Mr. Zerbe testified that it was a nylon blue soft cooler, "big enough for a six [p]ack" (*id.* at 1426). It was flexible and had a strap (*ibid.*). The strap was not twisted around petitioner's foot but rather, was just looped around, making it easy to pull off (*id.* at 1427).

During cross-examination, Mr. Zerbe also testified that when he reached petitioner after the accident, petitioner stated more than once that his "foot was stuck" (*id.* at 1419-1421). Mr. Zerbe also testified that petitioner had called out for his wife, wanted to be next to her, and put his arm around her on the beach (*id.* at 1424-1425). After a review of the record, the court finds that defense counsel's examination of Mr. Zerbe at trial was thorough and competent and accordingly, did not fall below the *Strickland* standard of objective reasonableness.

Furthermore, defense counsel presented expert testimony to show how the accident could have happened under petitioner's story that his foot was stuck. Specifically, the defense called Richard Allen Schmidt, a psychologist with a specialization in "human factors," which he described as essentially the same as ergonomics (Exh. 3 at 2665-66). Mr. Schmidt testified, based on his own physical study of the vehicle, that there was a way in the particular make and model of the van, for one's foot to become entangled between the brake and the accelerator pad, while wearing the shoes that petitioner was wearing (Exh. 3 at 2677-78, 2696-97, 2725-27).

1 Mr. Schmidt went on to testify that the unintended acceleration could cause a panic state, which could have prevented the petitioner from reasoning out of the situation, thereby causing the crash (*id.* at 2680-84, 2691, 2725-27). The jury did not accept this version of events. Petitioner does not show how additional testimony on the blue bag from a laywitness would have altered the verdict. *See Strickland*, 466 U.S. at 694.

Petitioner is not entitled to federal habeas relief on this claim. It simply cannot be said that the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts.

**CONCLUSION**

The petition for a writ of habeas corpus is **DENIED**.

Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: January 26, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.08\RAPOZA5616.RUL.wpd

19